**LightStar Financial Services, LLC**

*FACTORING AGREEMENT*

This FACTORING AGREEMENT ("Agreement") is entered into on this 9th day of January 2014, (the "Effective Date") at St. Joseph, Missouri by and between LightStar Financial Services, LLC., a Missouri limited liability company ("Purchaser"), with offices at 1717 Sixth Avenue, Saint Joseph, MO 64505 and Vanguard Health & Wellness, LLC. an Illinois limited liability company ("Seller"), whose chief executive office is located at 1585 Ellinwood Avenue, Suite 100, Des Plaines, IL 60016 ("Seller's Address").

**1. Definitions and Index to Definitions.** The following terms used herein shall have the following meaning. All capitalized terms not herein defined shall have that meaning set forth in the Uniform Commercial Code as enacted in the State of Missouri ("UCC").

**1.1 "Accountant Letter"** – shall have that meaning as set forth in Section 5.10 herein.

**1.2 "Accounts"** – shall have the meaning as set forth in the UCC, plus all Healthcare Insurance Receivables, Government Receivables, contract rights, documents, notes, instruments and all other forms of obligations owed to or owned by Seller, all general intangibles relating thereto, all proceeds thereof, all guaranties, supporting obligations and security therefore, and all goods and rights represented thereby and arising therefrom, including, but not limited to, returned, reclaimed and repossessed goods and the rights of stoppage in transit, replevin and reclamation.

**1.3 "ACH"** – the Automated Clearing House.

**1.4 "Avoidance Claim"** – any claim that any payment made with respect to any Account received by or for the benefit of Purchaser, whether the amount related thereto was paid by the Account Debtor, the Seller, on behalf of the Account Debtor or the Seller, or for the benefit of either, or any lien granted to Purchaser, is avoidable against or recoverable from Purchaser, under the U.S. Bankruptcy Code, any other debtor relief statute, including, but not limited to, preference claims, fraudulent transfer claims, or any other claim under any similar state law, insolvency or receivable statute.

**1.5 "Closing Fee"** – shall be One Thousand Four Hundred Fifty U.S. Dollars ($1,450.00).

**1.6 "Collateral"**- all of Seller's now owed or hereafter acquired Accounts (including Health Care Insurance Receivables and Government Receivables), Equipment, Inventory, Financial Assets, Chattel Paper, Electronic Chattel Paper, Letters of Credit and Letter of Credit Rights, General Intangibles, Investment Property, Deposit Accounts, Instruments, Money, motor vehicles, all books, records, files and computer data related to the foregoing, and all proceeds of the foregoing.

**1.7 "Collection Agent"**- shall mean an independent person or organization which has contracted with Seller to service all Accounts (including Healthcare Insurance Receivables) in accordance with an applicable agreement between the Collection Agent and Seller.

**1.8 "Dispute"** - any dispute, deduction, claim, offset, defense or counterclaim, of any kind whatsoever, regardless of whether the same is in an amount greater than, equal to or less than the Account concerned, regardless of whether the same is valid or bona fide, regardless of whether the same, in whole or in part, relates to the Account on which payment is being withheld or other Accounts or goods or services already paid for, and regardless of whether the same arises by reason of an act of God, civil strife, war, currency restriction, foreign political restriction or regulation, or the like, or any other reason.

**1.9 "Eligible Accounts"** - an Account which is acceptable for purchase as determined by Purchaser, in its sole discretion.

**1.10 "Environmental Laws"** – any federal, state or local law, rule regulation or order relating to pollution, waste disposal, industrial hygiene, land use or the protection of human health, safety, or welfare, plant life or animal life, natural resources, the environment or property.

**1.11 "Events of Default"** – shall have that meaning as set forth in Section 8.1 herein.

**1.12 "Factoring Fee"**- the fee charged for each purchase of an eligible account, computed as follows:
0.0897% per diem

**1.13 "Healthcare Insurance Receivable(s)"**- shall mean any Account wherein payment shall come from an insurance company whose insured is presumably covered by a medical, dental, vision, or any other form of health insurance policy.

**1.14 "Government Receivable(s)"**- shall mean all Accounts for which the Account Debtor is a government entity

including, without limitation, any federal or state agency or instrumentality thereof which is obligated to make any payments with respect to Medicare or Medicaid pursuant to the Medicare program (as set forth in Title 42 of the United States Code, sections 1395, et. seq.) or the Medicaid program (as set forth in Title 42 the United States Code, sections 1396, et seq.) or such other Accounts representing amounts owing under any other program established by federal or state law which requires that payments for health care services be made to the providers of such services.

**1.15 "Invalid Invoice Fee"** - As liquidated damages for Seller's failure to comply with Section 5.6, Seller shall pay an Invalid Invoice Fee in the amount of ten percent (10%) of the face amount of each invoice or Account, which fails to comply with Section 5.6 herein.

**1.16 "Missing Notation Fee"** – ten percent (10%) of the face amount of any purchased Account, which fails to have the required notation as required by Sections 2.7 or 4.1 herein.

**1.17 "Misdirected Payment Fee"** - ten percent (10%) of the amount of any payment on account of a purchased Account which has been received by Seller and not delivered to Purchaser on the business day following receipt by Seller, as required in Section 6.1(b) herein.

**1.18 "Monthly Minimum Fee"** – shall have that meaning as described in Section 2.11 herein.

**1.19 "Monthly Statement"** – shall have that meaning as described in Section 2.8 herein.

**1.20 "Obligations"** – shall mean and include each and all of the following: the obligation to pay and perform when due all debts and all obligations, liabilities, covenants, agreements, guarantees, warranties and representations of Seller to Purchaser, of any and every kind and nature, whether heretofore, now or hereafter owing, arising, due or payable from Seller to Purchaser; howsoever created, incurred, acquired, arising or evidenced; whether primary, secondary, direct, absolute, contingent, fixed, secured, unsecured, or otherwise; whether as principal or guarantor; liquidated or unliquidated; certain or uncertain; determined or undetermined; due or to become due; as a result of present or future advances or otherwise; joint or individual; pursuant to or caused by Seller's breach of this Agreement, or any other present or future agreement or instrument, or created by operation of law or otherwise; evidenced by a written instrument or oral; created directly between Purchaser and Seller or owed by Seller to a third party and acquired by Purchaser from such third party; monetary or nonmonetary.

**1.21 "Original Term"** – shall mean the term of this Agreement commencing on the Effective Date and concluding on January 8, 2015.

**1.22 "Purchase Limit"** - shall be Two Hundred Fifty Thousand U.S. Dollars ($250,000.00).

**1.23 "Purchase Price"** - shall have that meaning as described in Section 2.2 herein

**1.24 "Records"** - shall have that meaning set forth in Section 6.4 herein.

**1.25 "Renewal Term"** – shall mean each consecutive twelve-month term following the conclusion of the Original Term.

**1.26 "Reserve"** - a bookkeeping account on the books of Purchaser representing an unpaid portion of the Purchase Price, maintained by Purchaser to ensure Seller's performance with the provisions hereof.

**1.27 "Seller Lock Box" and "Seller Lock Box Account"** - shall mean a lock box established by Seller pursuant to a lock box agreement to receive collections or Proceeds of Government Receivables.

2. **Factoring.**

   **2.1 Sale of Accounts.** Seller agrees that it will do all of its business through Purchaser as Seller's sole factor and Seller hereby assigns and sells to Purchaser, as absolute owner, all Accounts. Purchaser shall be under no obligation to purchase Seller's Accounts and shall only purchase Eligible Accounts.

   **2.2 Purchase Price of Accounts.** The Purchase Price of each Eligible Account (the "Purchase Price") accepted by Purchaser shall be the face amount of the Account; less all deductions, credits, discounts and allowances at any time issued, owing, or granted to, or claimed, or taken by the Account Debtor; less Purchaser's Factoring Fees under Section 2.3 below; less the Reserve under Section 2.5 below.

   **2.3 Factoring Fee.** Purchaser shall charge Seller the Factoring Fees upon its accrual.

**2.4 Purchase Limit.** Purchaser shall not purchase Accounts if the unpaid balance on the Obligations exceeds the Purchase Limit.

**2.5 Reserve.** Purchaser shall charge and retain an amount equal to twenty percent **(20%)** of the face amount of each Account purchased from Seller, which amount shall be held as the Reserve. Purchaser may, from time to time, at its sole discretion, charge the aggregate Reserve with any losses which may be incurred in relation to any Account purchased hereunder or pay any of the Obligations therefrom. Purchaser agrees to maintain the Reserve mentioned herein, the maintenance of which, however, shall not vest the Seller any right, title, or interest herein, it being understood that the account shall be kept as a reserve to pay the Obligations of the Seller incurred under the provisions of this Agreement. Provided that there is no Event of Default, Purchaser, in its sole discretion, shall on a monthly basis, or at such other times in its sole discretion, initiate rebates to Seller from the Reserve.

**2.6 Repurchase Rights.** Purchaser may require that Seller immediately repurchase, by payment of the then unpaid face amount of any purchased Account, together with any unpaid fees relating to the purchased Account on demand, or at Purchaser's option, by Purchaser's charge to the Reserve, upon the following events: (a) an Account is not paid by the Account Debtor within ninety (90) days of the date set forth on the invoice for the purchased Account; (b) Seller has breached any warranties or promises in this Agreement with regard to an unpaid Account; (c) Seller and Account Debtor are involved in a Dispute of any kind, regardless of validity; (d) the Account Debtor asserts a claim of loss of any kind against Seller and/or Purchaser; and/or (e) an insolvency or other financial inability of the Account Debtor to pay.

**2.7 Assignments and Other Documentation.** Seller shall place the following legend on the face of all bills and invoices for all Accounts assigned to and purchased by Purchaser hereunder, with the exception of Government Receivables: "This receivable has been assigned to and is owned by and payable only to LightStar Financial Services, LLC at 1717 Sixth Avenue, St. Joseph, MO 64505 or electronically at Account No. 145571739880 ABA Routing No. 101000187. Any objection to this invoice must be reported to LightStar Financial Services, LLC at (816) 265-2555."  Seller will provide Purchaser with an assignment and schedule of all Accounts sold and assigned to Purchaser in a form satisfactory to Purchaser. Seller will also furnish Purchaser with the original and a duplicate of its customers' invoices, the original to be sent by Purchaser to the customer, with postage and clerical charge thereon to be borne by the Seller, or at Purchaser's option, sent by the Seller to the customer with a copy in each instance to Purchaser, and Seller will deliver to Purchaser conclusive evidence of all shipments, all of which shall be satisfactory to Purchaser. Billings on all invoices, by whomever done, shall constitute assignments thereof to Purchaser of the Accounts represented thereby, whether or not Seller executes any other specific instrument of assignment. Seller will hold at its offices and be fully responsible to Purchaser for any and all shipping receipts evidencing delivery of goods regarding Accounts. All such shipping evidences held by Seller shall be available for Purchaser's inspection and for delivery to Purchaser at its request at any time. In the event that Seller sends to an Account Debtor any invoice evidencing a purchased Account which does not contain such notation (or such other notation otherwise acceptable to Purchaser as provided for in this Section), it will be impracticable or extremely difficult to determine the resulting damages suffered by Purchaser. It is therefore agreed that Seller shall immediately pay to Purchaser, as liquidated damages, the Missing Notation Fee.

**2.8 Monthly Statement of Account.** Purchaser will send a Monthly Statement of account or post account information online on its website. Unless Purchaser receives a written exception to the Monthly Statement or any online posting within twenty-five (25) days after it is rendered or posted online, the Monthly Statement or online statement shall become an account stated and be deemed accepted by Seller and shall be conclusively and binding upon the Seller.

**2.9 Credits and Returns.** Seller will issue credits only with Purchaser's prior written approval, and only if claimed by the Account Debtor. In addition to the Accounts, Seller hereby sells, assigns and transfers to Purchaser all of its right, title and interest in and to the goods, the sale of which resulted in the creation of Accounts, and in all such goods that may be returned by Account Debtors, and all causes of action and rights in connection therewith which Seller now has or may hereafter acquire, including its rights of reclamation, replevin and stoppage in transit and the rights as an unpaid vendor or lienor. Any goods so recovered shall be treated as returned goods, and shall be set aside, marked with Purchaser's name and held for Purchaser's account as owner. Seller shall notify Purchaser promptly of all such returns.

**2.10 Term of this Agreement -** This Agreement shall be in effect for the Original Term and shall automatically renew for consecutive Renewal terms unless terminated by either party giving the other written notice not less than sixty (60) days prior to the end of the Original Term or any Renewal Term, which written notice shall clearly state its intention to terminate at the end of the current term; provided, however, that if Seller shall elect to terminate the Agreement pursuant to this Section 2.10, Seller shall pay Purchaser, in addition to all other obligations, the Minimum Monthly Fee as determined in Section 2.11 below.

**2.11 Minimum Monthly Fee.** Purchaser would not have entered into this Agreement unless Seller guaranteed Purchaser that the Factoring Fees would be at least $0.00 per month (the "Minimum Monthly Fee").  In the event that the Factoring Fees, as determined in Section 2.3 above, during any calendar month is less than the Minimum Monthly Fee, the Seller shall pay to Purchaser the Factoring Fee plus an amount equal to the difference between the Factoring Fees and the Minimum Monthly Fee, which amount shall be due and payable on the first day of the following calendar month.

**2.12 Payment of Other Fees**. Seller shall pay to Purchaser all other fees and costs incurred under this Agreement including but not limited to the Closing Fee immediately when its due.

3. **"Collateral," Grant of Security Interest, ACH Authorization.**

**3.1 Collateral.** As security and collateral for the Obligations, Seller hereby grants Purchaser a continuing security interest in, and assigns to Purchaser, all of Seller's right, title and interest in and to the Collateral.

**3.2 Filing Authorization.** Seller hereby authorizes Purchaser to file any document it deems necessary to perfect its security interest in the Collateral, including but not limited to UCC-1 financing statements and any applicable amendments or continuation statements.

**3.3 ACH Authorization.** In order to satisfy any of the Obligations and facilitate the purchase of Accounts, Purchaser is hereby authorized by Seller to initiate electronic debit or credit entries through the ACH.

4. **Seller Lock Box.**

**4.1 Lock Box.** Seller shall establish a deposit account with and enter into a lock box agreement with a bank acceptable to Purchaser, in its sole discretion, to which all collections of Government Receivables in the form of cash, checks, wire transfers or any other form of payment are remitted and deposited to the Seller Lock Box Account. Seller may not revoke or otherwise change the Seller Lock Box Account without the written permission of Purchaser, which permission may be withheld by Purchaser, in its sole discretion. Any and all purchased Government Receivables shall bear a legend, which instructs the Account Debtor to render payment thereon to the Seller Lock Box Account. In the event that Seller sends to an Account Debtor an invoice evidencing a purchased Government Receivable, which does not contain such a legend, it will be impracticable or extremely difficult to determine the resulting damages suffered by Purchaser. It is therefore agreed that Seller shall immediately pay to Purchaser as liquidated damages the Missing Notation Fee.

5. **Representations, Warranties and Covenants of Seller.** To induce Purchaser to enter into this Agreement, Seller represents and warrants that each of the following representations and warranties now is and hereafter will continue to be true and correct in all respects and Seller has and will timely perform each of the following covenants:

**5.1 Existence and Power.** If Seller is a partnership, limited liability company or corporation, Seller is and will continue to be duly authorized, validly existing and in good standing under the laws of the jurisdiction of its organization. Seller is and will continue to be qualified and licensed in all jurisdictions in which the nature of the business transacted by it, or the ownership or leasing of its property, make such qualification of licensing necessary, and Seller has and will continue to have all requisite power and authority to carry on its business as it is now, or may hereafter be, conducted.

**5.2 Authority.** Seller is, and will continue to be, duly empowered and authorized to enter into, and grant security interests in its property, pursuant to and perform its obligations under this Agreement, and all other instruments and transactions contemplated hereby or relating hereto. The execution, delivery and performance by Seller of this Agreement, and all other instruments and transactions contemplated hereby or relating hereto, have been duly and validly authorized, are enforceable against the Seller in accordance with their terms, and do not and will not violate any law or any provision of, nor be grounds for acceleration under any agreement, indenture, note or instrument which is binding upon Seller, or any of its property, including, without limitation, Seller's Operating Agreement, Partnership Agreement, Articles of Incorporation, By-Laws and any Shareholder Agreements (as applicable).

**5.3 Name; Trade Names; Styles; Provider Names and Provider Identification Numbers.** Seller has set forth above its absolutely true and correct name. Listed below is each prior true name of Seller and each fictitious name, trade name and trade style by which Seller has been, or is now known, or has previously transacted, or now transacts business:

_____
_____

Seller shall provide Purchaser with twenty (20) days' advance written notice before doing business under any other name, fictitious name, trade name or trade style. Seller has complied, and will hereafter comply, with all laws relating to the conduct of business under, the ownership of property in, and the renewal or continuation of the right to use a corporate, fictitious or trade name or trade style.

Set forth as Schedule 5.3 is a true, exact, correct and complete list of every provider name and provider identification number (including, but not limited to, any National Provider Identifier (NPI), Medicare Identification Number and Tax Identification Number) under which Seller has previously or now transacts business regarding Seller's Healthcare Insurance Receivables and Government Receivables. If any of the provider names listed below are different from the name of Seller, as identified above in this Agreement, Seller shall provide to Purchaser such additional information and records regarding the provider name as Purchaser shall require.

Seller shall provide Purchaser with twenty (20) days' advance written notice before doing business with regard to any Healthcare Insurance Receivable or Government Receivable under any other name, fictitious name, trade name or trade style, provider name or provider identification number.

**5.4 Place of Business; Location of Collateral.** Seller's books and records, including, but not limited to, the books and records relating to Seller's Accounts are, and will be kept and maintained, at Seller's Address unless and until Purchaser shall otherwise consent in writing. In addition to Seller's Address, Seller has places of Business and Collateral is located only at the following locations:
_____
_____.

Seller will provide Purchaser with at least twenty (20) days' advance written notice in the event Seller moves the Collateral, or obtains, opens or maintains any new or additional place(s) for the conduct of Seller's business or the location of any Collateral, or closes any existing place of business.

**5.5 Title to Collateral; Liens.** Seller is now, and will at all times hereafter be, the true, lawful and sole owner of all the Collateral. With the exception of the security interest granted to Purchaser, the Collateral now is and will hereafter remain, free and clear of any and all liens, charges, security interests, encumbrances and adverse claims. Except as expressly provided to the contrary in this Section, Purchaser now has, and will hereafter continue to have, a fully perfected and enforceable choate first priority security interest in all of the Collateral, and Seller will at all times defend Purchaser and the Collateral against all claims and demands of others.

**5.6 Accounts; Invalid Invoice Fee.** Each and every Account assigned to Purchaser shall, on the date the assignment is made and thereafter, comply with all of the following representations, warranties and covenants: each Account represents an undisputed bona fide existing unconditional obligation of the Account Debtor created by the sale, delivery, and acceptance of goods or the rendition of services in the ordinary course of Seller's business; each Account is owned by Seller free and clear of any and all deductions, Disputes, liens, security interests and encumbrances; the Account Debtor has received and accepted the goods sold and services rendered which created the Account and the invoice therefor and will pay the same without any Dispute; no Account Debtor on any Account is a shareholder, director, partner or agent of Seller, or is a person or entity controlling, controlled by or under common control with Seller; no Account is owed by an Account Debtor to whom Seller is, or may become, liable in connection with goods sold or services rendered by the Account Debtor to Seller or any other transaction or dealing between the Account Debtor and Seller.

Seller's breach of any of the foregoing warranties shall result in the imposition of the Invalid Invoice Fee as liquidated damages for additional administrative and other expenses incurred by Purchaser as a result of Seller's breach hereof. Immediately upon discovery by Seller that any of the foregoing representations, warranties, or covenants are or have become untrue with respect to any Account, Seller shall immediately give written notice thereof to Purchaser. Seller will promptly notify Purchaser of, and settle all Disputes, at Seller's own cost and expense (including attorneys' fees), and Seller will immediately pay Purchaser the amount of all Accounts affected by any Dispute. Any Dispute not settled by Seller within sixty (60) days after the maturity of the invoice affected thereby may, if Purchaser so elects, be settled, compromised, adjusted or litigated by Purchaser directly with the Account Debtor or other complainant for Seller's account and risk and upon such terms and conditions as Purchaser, in Purchaser's sole discretion, deems advisable. Purchaser is under no duty to investigate the validity or merits of any Dispute. Purchaser may also, in Purchaser's discretion, take possession of and sell or cause the sale of any returned or recovered merchandise, at such prices, upon such terms and to such purchasers as Purchaser deems proper, and in any event to charge the deficiency, costs and expenses thereof, including attorneys' fees, to Seller. In addition to all other rights Purchaser has hereunder, whenever there is any Dispute, or if any Account as to which Purchaser has not assumed the risk of nonpayment is unpaid at its maturity, Purchaser may charge the amount of the Account so affected or unpaid (as well as all other Accounts due and owing from that Account Debtor) to Seller; but such chargeback shall not be deemed nor shall it constitute a reassignment to Seller of the Account affected thereby, and title thereto and to the Goods giving rise thereto shall remain in the possession of Purchaser until Purchaser is fully reimbursed, regardless of the date or dates on which Purchaser charges back the amount of any Account with respect to which there is any Dispute, or the amount owing from a Account Debtor which has raised any Dispute. Seller agrees that, immediately upon the occurrence of any such Dispute, any Obligation Purchaser may have otherwise had hereunder to bear the risk of non-payment with respect to such Account shall cease and such risk of nonpayment shall immediately revert to and be assumed by Seller, without notice and without any action on Purchaser's part to effect the same.

**5.7 Documents Genuine; Legal Compliance; Disposition.** All statements made and all unpaid balances appearing in all invoices, instruments and other documents evidencing the Accounts are and shall be true and correct and all such invoices, instruments and other documents, and all of Seller's books and records are and shall be genuine and in all respects what they purport to be, and all signatories and endorsers have full capacity to contract. All sales and other transactions underlying or giving rise to each Account shall fully comply with all applicable laws and government rules and regulations. All signatures and endorsements on all

documents, instruments, and agreements relating to all Accounts are and shall be genuine and all such documents, instruments and agreements are and shall be legally enforceable in accordance with their terms. Seller has not, and shall not hereafter sell, assign, pledge, encumber, forgive (completely or partially), settle for less than payment in full, or transfer or dispose of any Account, or agree to do any of the foregoing.

**5.8 Maintenance of Collateral.** Seller has maintained and will hereafter maintain the Collateral and all of Seller's assets useful or necessary in the conduct of Seller's business in good working order and condition, at Seller's sole cost and expense. Seller will not use the Collateral or any of Seller's other properties, or any part thereof, in any unlawful business or for any unlawful purpose and will not secrete or abandon the Collateral, such properties, or any part thereof. Seller will not store any of the Collateral with any warehouseman or any other third party without Purchaser's prior written consent. Seller will immediately advise Purchaser in writing of any event causing loss or depreciation and of any material adverse change in the condition of the Collateral or of any of Seller's other properties.

**5.9 Books and Records.** Seller has maintained and will continue to maintain at Seller's Address complete and accurate books and records comprising a standard and modern accounting system in accordance with generally accepted accounting principles that accurately and correctly record and reflect Seller's income, expenses, liabilities, operations, accounts, and ownership and location of the Collateral and any other asset now or hereafter belonging to Seller. Seller has not entered into any agreement with any accounting firm or third party to prepare or store Seller's books and records or any part thereof at any location other than Seller's Address, and Seller shall not enter into any such agreement without first obtaining Purchaser's written consent; any consent that Purchaser may give shall be conditioned upon such accounting firm or other third party first agreeing to give Purchaser the same rights with respect to access to books and records and related rights as Purchaser has under Section 6.4 of this Agreement, regardless of where such books and records are kept or in what form they are maintained. In the event that at the time of execution of this Agreement, Seller's books and records are presently in the possession of an accounting firm or third party, Seller will, concurrently with the execution of this Agreement, and at any time thereafter upon request by Purchaser, provide Purchaser with such written agreement from such accounting firm or third party, and Seller will not hereafter transfer the books and records to any other accounting firm or other third party without first obtaining Purchaser's written consent and providing Purchaser with such agreement. All reserves (including, without limitation, reserves for bad debts, depreciation and taxes) provided for upon Seller's books and records are now, and will hereafter be, maintained in sufficient amounts in accordance with generally accepted accounting principles consistently applied. All such books and records and all documents relating to any of the Collateral are and will continue to be genuine and in all respects what they purport to be and will contain such information as may be requested by Purchaser.

**5.10 Financial Condition and Statements.** All financial statements (including, but not limited to, balance sheets, profit and loss figures, and accountants' comments) now or hereafter delivered to Purchaser have been, and will be, prepared in conformity with generally accepted accounting principles and now and hereafter will completely and accurately reflect the financial condition, contingent liabilities and results of Seller and Seller's operations at the times and for the periods therein stated. Since the last date covered by any such statement, there has been no material adverse change in the financial condition, operations or any other status of the Seller. Seller is now, and at all times hereafter will continue to be, solvent. The covenant set forth in the preceding sentence shall be deemed breached if at any time Purchaser estimates that the value of all Seller's assets, if sold in bulk for liquidation purposes, would not be sufficient to pay the total of Seller's liabilities (whether or not such liabilities are then due) or if Purchaser has determined that Seller has failed to pay promptly when due all loans and all debts to trade and other creditors (unless Purchaser is satisfied that the reason for such nonpayment is a bona fide Dispute between Seller and any of its creditors concerning the amount due). Seller shall cause to be prepared and shall provide to Purchaser complete financial statements of Seller (including, but not limited to, balance sheet, profit and loss statement and accountants' comments) as follows: (i) financial statements for each month, by the 15th day of the following month; (ii) financial statements for each fiscal quarter, within forty-five (45) days after the end of the fiscal quarter; and (iii) financial statements for each fiscal year, within sixty (60) days following the end of the fiscal year. Seller shall also deliver to Purchaser a copy of all other financial statements prepared with respect to Seller no later than thirty (30) days after the preparation or receipt thereof by Seller. At Purchaser's request, all such annual financial statements shall be prepared and certified by independent certified public accountants acceptable to Purchaser. Seller shall, promptly following the date hereof, deliver a letter ("Accountant Letter") to its accountants, advising them that one of the principal purposes of the audited financial statements which the accountants may be asked to prepare annually is to provide Purchaser and the financial institutions with which it has rediscount, factoring or other relationships, with information regarding Seller's financial condition, and directing the accountants to send such audited financial statements directly to Purchaser and said financial institutions, and, upon Purchaser's request, to meet with Purchaser and such institutions annually or more frequently to discuss said financial statements and any questions regarding the same.  If, hereafter, Seller changes accountants, the new accountants shall be independent certified public accountants acceptable to Purchaser, and Seller shall deliver the Accountant Letter to such new accountants. All costs, expenses and fees pertaining to the matters referred to in this Section shall be borne solely and exclusively by Seller.

**5.11 Tax Returns and Payments; Pension Contributions.** Seller has timely filed, and will hereafter timely file, all tax returns and reports required by foreign, federal, state or local law. Seller has timely paid, and will hereafter timely pay, all foreign, federal, state and local taxes, assessments, deposits and contributions now or hereafter owed by Seller (including, but not limited to, income, franchise, personal property, real property, FICA, excise, withholding, sales and use taxes). Seller may defer payment of any

contested taxes provided that Seller: (i) in good faith contests Seller's obligation to pay such taxes by appropriate proceedings promptly and diligently instituted and conducted; (ii) notifies Purchaser in writing of the commencement and of any material development in such proceedings; and (iii) posts bonds or takes any other steps required to keep such contested taxes from becoming a lien against or charge upon any of the Collateral or other properties of Seller. Seller is unaware of any claims or adjustments proposed for any of Seller's prior tax years which could result in additional taxes becoming due and payable by Seller. Seller has paid, and shall continue to pay, all amounts necessary to fund all present and future pension, profit sharing and deferred compensation plans in accordance with their terms, and Seller has not and will not withdraw from participation in, permit partial or complete termination of, or permit the occurrence of any other event with respect to, any such plan which could result in any liability of Seller, including, without limitation, any liability to the Pension Benefit Guaranty Corporation or its successors or any other government agency. When requested, Seller will furnish Purchaser with proof satisfactory to Purchaser of Seller's making the payment or deposit of all such taxes and contributions, such proof to be delivered within five (5) days after the due date established by law for each such payment or deposit. In the event Seller fails or is unable to pay or deposit such taxes or contributions, Purchaser may, but is not obligated to, pay the same and treat all such advances as additional Loans to Seller. Such advances shall bear interest at the highest rate of the outstanding Loans to Seller.

**5.12 Compliance with Law, and Environmental Laws.** Seller has complied, and will hereafter comply, with all provisions of all foreign, federal, state and local law relating to Seller including, but not limited to, those relating to Seller's ownership of real or personal property, conduct and licensing of Seller's business and employment of Seller's personnel. Seller has been and is currently in compliance with all applicable Environmental Laws, including obtaining and maintaining in effect all permits, licenses or other authorizations required by applicable Environmental Laws. There are no claims, liabilities, investigations, litigation, administrative proceedings, whether pending or threatened, or judgments or orders relating to any hazardous materials asserted or threatened against Seller or relating to any real property currently or formerly owned, leased or operated by Seller.

**5.13 Litigation.** There is no claim, suit, litigation, proceeding or investigation pending or threatened by or against or affecting Seller in any court or before any regulatory commission, board or other government agency (or any basis therefor known to Seller) which might result, either separately or in the aggregate, in any adverse change in the business, prospects or condition of Seller, or in any impairment in the ability or right of Seller to carry on its business in substantially the same manner as it is now being conducted. Seller will immediately inform Purchaser in writing of any claim, proceeding, litigation or investigation hereafter threatened or instituted by or against Seller.

**5.14 Complete Disclosure.** There is no fact which Seller has not disclosed to Purchaser in writing which could materially adversely affect the properties, business or financial condition of Seller or any of the Collateral or which is necessary to disclose in order to keep the foregoing representations and warranties from being misleading.

**5.15 Continuing Effect.** All representations, warranties and covenants of Seller contained in this Agreement and any other agreement with Purchaser shall be true and correct at the time of the effective date of each such agreement and shall be deemed continuing and shall remain true, correct and in full force and effect until payment and satisfaction in full of all of the Obligations, and Seller acknowledges that Purchaser is and will be expressly relying on all such representations, warranties and covenants in making Loans to Seller.

**5.16 No Government Investigations.** There are no proceedings or investigations in which Seller is named as a party or any other proceedings or investigations pending or threatened before any government authority or any arbitration or similar proceedings which would make a determination which may materially prejudice Purchaser with respect to: i) the validity of any Account, Healthcare Insurance Receivable or Government Receivable or any contract related thereto; (ii) the bankruptcy or insolvency of any Account Debtor; (iii) the payment of any such Account, Healthcare Insurance Receivable or Government Receivable; or (iv) the validity or enforceability of any such Account, Healthcare Insurance Receivable or Government Receivable. Seller shall notify Purchaser within five (5) business days of any such proceeding, investigation, or arbitration.

**5.17 No Violation of Federal or State Law.** No Account, Healthcare Insurance Receivable, or Government Receivable or any contract related thereto in any manner contravenes any federal, state or local law, rule or regulation applicable thereto.

**5.18 Standard of Servicing.** Without limiting the generality of the foregoing, Seller or Collection Agent shall service the Accounts, Healthcare Insurance Receivables, and Government Receivables in accordance with generally accepted healthcare industry standards for billing, collecting and servicing such Accounts, Healthcare Insurance Receivables and Government Receivables.

**5.19 Notification of Violations.** Seller shall within five (5) business days notify Purchaser in writing of any violation of any law, statute, regulation or ordinance of any government entity, or any agency thereof, applicable to Seller which may materially affect the Collateral or Seller's operations.

**6. Additional Continuing Duties of Seller.**

    **6.1 Duties Regarding Accounts.**

        (a)   Seller shall deliver to Purchaser schedules and assignments of all Accounts on Purchaser's standard form; provided, however, that Seller's failure to execute and deliver the same shall not affect or limit Purchaser's security interest and other rights in and to all of Seller's Accounts, nor shall Purchaser's failure to purchase a specific Account affect or limit Purchaser's security interest and other rights therein. Together with each such schedule and assignment, or later if requested by Purchaser, Seller shall furnish Purchaser with copies (or, at Purchaser's request, originals) of all contracts, orders, invoices, and other similar documents, and all original shipping instructions, delivery receipts, bills of lading, and other evidence of delivery, for any goods the sale or disposition of which gave rise to such Accounts, and Seller warrants the genuineness of all of the foregoing. Seller shall also furnish to Purchaser an aged accounts receivable trial balance in such form and as often as Purchaser requests, and Seller agrees that Purchaser may, from time to time, verify directly with the respective Account Debtors the validity, amount and any other matters relating to the Accounts by means of mail, telephone or otherwise, either in the name of Seller or Purchaser or such other name as Purchaser may choose. In addition, Seller shall deliver to Purchaser the originals of all instruments, chattel paper, security agreements, guarantees and other documents and property evidencing or securing any Accounts, immediately upon receipt thereof and in the same form as received, with all necessary endorsements (all of which shall be with recourse).

        (b)   Except as provided for in Section 4.1 for Government Receivables, Purchaser shall have the sole and exclusive right to collect the Accounts. All monies, checks, notes, drafts, money orders, acceptances and other things of value and items of payment, together with any and all related vouchers, identifications, communications and other data, documents and instruments, which for any reason may be received by Seller (or by any receiver, trustee, custodian or successor in interest of Seller, or any person acting on behalf of Seller) in payment of, or in reference to, the Accounts shall belong to Purchaser, and, not later than one (1) day after receipt thereof by Seller, Seller shall deliver the same to Purchaser, at Purchaser's office in the original form in which the same are received, together with any necessary endorsements, including, without limitation, the endorsement of Seller, all of which endorsements shall be with full recourse. Seller shall have no right, and agrees not to commingle any of the proceeds of any of the collections of the Accounts with Seller's own funds and Seller agrees not to use, divert or withhold any such proceeds. Seller hereby divests itself of all dominion over the Accounts and the proceeds thereof and collections received thereon. Seller shall make entries on its books and records in form satisfactory to Purchaser disclosing the absolute and unconditional assignment of all Accounts to Purchaser. Purchaser may charge to the Obligations all costs and expenses incurred by Purchaser in collecting Accounts, including, without limitation, postage, telephone and telegraph charges, salaries of Purchaser personnel, and attorneys' fees. The Parties hereto agree that if any payment on account of a purchased Account which has been received by Seller is not delivered in kind to Purchaser on the next business day following the date of receipt by Seller, it will be impracticable or extremely difficult to determine the resulting damages suffered by Purchaser. It is therefore agreed that in the event of such a breach by Seller, Seller shall pay Purchaser a sum equal to ten percent (10%) of the amount of any payment on account of a purchased Account which has been received by Seller and not delivered in kind to Purchaser on the next business day (the "Misdirected Payment Fee").

        (c)   Any goods which are returned by an Account Debtor or otherwise recovered by or for the benefit of Seller shall be physically segregated, posted with written notice that they are subject to Purchaser's security interest, and held in trust for Purchaser for such disposition as Purchaser shall direct. Seller shall promptly notify Purchaser of all such returns and recoveries. No return of merchandise shall be accepted by Seller and no sale of returned goods shall be made by Seller without Purchaser's prior written consent. Purchaser shall have the right acting alone to accept the return of any goods directly from an Account Debtor, without notice to or consent by Seller, and neither the delivery by Seller of returned or recovered goods to Purchaser, nor the acceptance by Purchaser of returns directly from an Account Debtor shall in any way affect Seller's liability to Purchaser on account of the Obligations.

        (d)   Seller shall promptly notify Purchaser of all disputes and claims with respect to the Accounts. Seller shall not, without Purchaser's prior written consent, compromise or adjust any Account, or grant any discount, credit, allowance, or extension of time for payment to any Account Debtor. Purchaser shall have the right, in its sole and absolute discretion, to settle, accept reduced amounts and adjust disputes and claims directly with, and give releases on behalf of Seller to Account Debtors for cash, credit or otherwise, upon terms which Purchaser, in its sole and absolute discretion, considers advisable, and in such case Purchaser will credit Seller's account with only the net amounts of cash received by Purchaser in payment of the Accounts, less all costs and expenses (including, without limitation, attorneys' fees) incurred by Purchaser in connection with the settlement or adjustment of such disputes and the collection of such Accounts.

    **6.2  Insurance.**   Seller shall, at all times, and for such periods of time as Purchaser may require, at Seller's expense, insure all of the insurable Collateral, and all of Seller's books and records, by financially sound and reputable insurers acceptable to Purchaser, in the form of extended coverage policies against loss or damage by theft, embezzlement, fire, explosion, flood, sprinkler, or any other insurable event or risk that Purchaser may require, to the fullest extent of the insurable value thereof. All such insurance policies shall name Purchaser as the exclusive loss payee, shall provide that proceeds payable thereunder shall be payable directly to Purchaser unless notarized written authority to the contrary is obtained from Purchaser, and shall also provide that no act or default of Seller or any other person shall affect the right of Purchaser to recover thereunder. Upon receipt of the proceeds of any such insurance,

Purchaser shall apply such proceeds in reduction of the Obligations, whether or not then due, in such order and manner as Purchaser shall determine in its sole discretion. Seller shall provide Purchaser with the original or a certificate of each such policy of insurance which shall contain a provision requiring the insurer to give not less than twenty (20) days advance written notice to Purchaser in the event of cancellation or termination of the policy for any reason whatsoever. If Seller fails to provide or pay for any such insurance, Purchaser is authorized (but not obligated) to procure the same at Seller's expense. Seller agrees to deliver to Purchaser, promptly as rendered, true and correct copies of all reports made to all insurance companies.

**6.3 Reports; Certificates.** At its sole cost and expense, Seller shall report, in form satisfactory to Purchaser, such information as Purchaser may request regarding the Collateral; such reports shall be for such periods, shall reflect Seller's records at such time and shall be rendered with such frequency as Purchaser may designate. At its sole cost and expense, Seller shall promptly provide Purchaser with all such other information concerning its affairs as Purchaser may request from time to time hereafter, and shall immediately notify Purchaser of any adverse change in Seller's financial condition and or any condition or event which constitutes a breach or an Event of Default under this Agreement. All reports furnished to Purchaser shall be complete, accurate and correct in all respects at the time furnished. Whenever requested, Seller shall deliver to Purchaser a certificate signed by Seller (or, if Seller is a corporation, by Seller's president and chief financial officer, in their individual capacities, by all of Seller's general partners if Seller is a partnership, or by Seller's managing members if Seller is a limited liability company) warranting and representing that all reports, financial statements and other documents delivered or caused to be delivered to Purchaser under the terms of this Agreement are complete and correct, and accurately present the financial condition of Seller, and that there exists on the date of delivery of said certificate to Purchaser no condition or event which constitutes a breach or Event of Default under this Agreement.

**6.4 Access to Collateral, Books and Records.** At any and all times Purchaser, and any person designated by Purchaser, shall have free access to, and the right without hindrance or delay to inspect, audit, examine and test the Collateral and any other property of Seller, wherever located, and to inspect, audit, check, copy and make extracts from Seller's and Seller's accountant's books, records and accounts (hereinafter collectively the "Records") including, but not limited to, all storage media, computer data and other devices and programs related thereto, printouts, minute books, journals, ledgers, work papers, financial statements, balance sheets, profit and loss statements, orders, receipts and any correspondence and other data relating to Seller's business or to any transactions Seller has entered into, no matter how or where such records may be maintained, generated or stored and for such purposes may enter into and at no charge remain upon the Seller's premises as often and for so long as Purchaser may desire, and may use all computers and other equipment and devices which Seller owns or leases or otherwise has available to it. Seller hereby irrevocably authorizes and directs any person including, but not limited to, any of Seller's directors, officers, employees, agents, accountants and attorneys having possession or control of any of the records to physically deliver them to Purchaser or any person designated by Purchaser upon Purchaser's request or, at the option of Purchaser, make them available to Purchaser wherever the records may be located. Seller waives the benefit of any accountant-client privilege or other evidentiary privilege precluding or limiting the disclosure, divulgence or delivery of any of the records. Purchaser, and any person designated by Purchaser, at all times, by or through any of its officers, agents, employees, attorneys, and accountants, shall have the right to possession of, or move to the premises of Purchaser or any agent of Purchaser for so long as Purchaser may desire, all or any part of the records, to make full use thereof in aid of Purchaser's rights under this Agreement.

**6.5 Prohibited Transactions.** Seller shall not hereafter, without Purchaser's prior written consent: merge, consolidate, dissolve, acquire any other corporation; enter into any transaction not in the usual course of business, make any investment in any securities other than securities of the United States of America; guarantee or otherwise become in any way liable with respect to the obligations of another party or entity; pay or declare any dividends upon Seller's stock; redeem, retire, purchase or otherwise acquire, directly or indirectly, any of Seller's stock; make any change in Seller's name, identity, corporate or capital structure; alter any of Seller's business objectives, purposes, or operations or financial structure in such a manner as to adversely affect the ability of Seller to pay or perform any of the Obligations; lend or distribute any of Seller's property or assets; incur any debts, outside of the ordinary course of Seller's business, except extensions of existing debts and interest thereon; sell, lease, transfer, assign or otherwise dispose of any of the Collateral; or make any capital expenditures or leasehold improvements at a cost in the aggregate in any twelve-month period of more than $25,000.

**6.6 Notification of Changes.** Seller will promptly notify Purchaser in writing of any change of its officers, member, directors, partners, or key employees, a death of any partner or joint venturer (if Seller is a partnership or joint venture), any purchase out of the regular course of Seller's business and any adverse or material change in the business or financial affairs of Seller.

**6.7 Litigation Cooperation.** Should any suit or proceeding be instituted by or against Purchaser with respect to any Collateral or for the collection of enforcement of any Account, or in any manner relating to Seller, Seller shall, without expense to Purchaser, and wherever and whenever designated by Purchaser, make available Seller and its officers, employees and agents and Seller's books, records and accounts to the extent that Purchaser may deem necessary in order to prosecute or defend any such suit or proceeding.

**6.8 Execute Additional Documentation.** Seller agrees, at its sole cost and expense, on demand by Purchaser, to do all things and to execute all such security agreements, control agreements, deeds of trust, mortgages, assignments, certificates of title, applications for vehicle titles, affidavits, reports, notices, schedules of Accounts and all other documents, in form satisfactory to

Purchaser, as Purchaser, in its sole and absolute discretion, may deem necessary or useful in order to perfect and maintain Purchaser's perfected first-priority security interest in the Collateral, and in order to fully consummate all of the transactions contemplated under this Agreement.

7. **Application of Payments.** Checks, instruments and all other non cash payments delivered to Purchaser in payment or on account of the Accounts or the Obligations constitute conditional payment only until such items are actually paid in cash to Purchaser, for the purpose of computing fees earned by Purchaser, credit therefor and for bank wire transfers shall be given as of the second (2nd) day after receipt by Purchaser, with exception of payments made by and through ACH, which are applied as same day availability. All payments made by or on behalf of, and all credits due to Seller, may be applied and reapplied in whole or in part to any of the Obligations to such extent and in such manner as Purchaser shall determine in its sole discretion. Purchaser shall have the continuing exclusive right to apply and reapply any and all such payments in such manner as Purchaser shall determine in its sole discretion, notwithstanding any entry by Purchaser upon any of its books and records.

8. **Events of Default and Remedies.**

   **8.1 Events of Default.** If any one or more of the following events shall occur, any such event shall constitute an Event of Default and Seller shall provide Purchaser with immediate written notice thereof: (a) Any warranty, representation, statement, report or certificate made or delivered to Purchaser by Seller or any of Seller's officers, employees or agents now or hereafter is incorrect, false, untrue or misleading in any respect whatever; (b) Seller shall fail to perform or comply with or otherwise shall breach, any other term or condition contained in this Agreement, or any other agreement whether now or hereafter existing between Purchaser and Seller; (c) Seller shall fail to pay or perform any other Obligation when due; (d) A material impairment of the prospect of payment or performance of the Obligations or a material impairment of the value of the Collateral or any impairment in the priority of Purchaser's security interests; (e) Any event shall arise which may result or actually result in the acceleration of the maturity of the indebtedness of Seller to others under any loan or other agreement or undertaking now or hereafter existing; (f) Seller shall fail promptly to perform or comply with any term or condition of any agreement now or hereafter existing with any third party resulting in an actual or potential material adverse effect on Seller's business; (g) Any levy, assessment, attachment, seizure, lien or encumbrance for any cause or reason whatsoever, upon all or any part of the Collateral or any other asset of Seller (unless discharged by payment, release or fully bonded against not more than ten (10) days after such event has occurred); (h) Dissolution, termination of existence, insolvency or business failure of Seller; or appointment of a receiver, trustee or custodian, for all or any part of the property of, assignment for the benefit of creditors by, or the commencement of any proceeding by or against Seller under any reorganization, bankruptcy, insolvency, arrangement, readjustment of debt, dissolution or liquidation law or statute of any jurisdiction, now or hereafter in effect; or entry of a court order which enjoins, restrains or in any way prevents Seller from conducting all or any part of its business; or failure to pay any foreign, federal, state or local tax or other debt of Seller unless, with respect to any such tax, Seller complies with the provisions of Section 5.11; (i) A notice of lien, levy or assessment is filed of record with respect to any of Seller's assets by the United States or any department, agency or instrumentality thereof, or by any state, county, municipal or other government agency, or if any taxes or debts now or hereafter owing to any one or more of them becomes a lien, whether choate or otherwise, upon all or any of the Collateral or any other assets of Seller (other than a lien for real property taxes which are not yet due and payable); (j) Death or insolvency or incompetency of any guarantor of any or all of the Obligations; appointment of a conservator or guardian of the person of any such guarantor; appointment of a conservator, guardian, trustee, custodian or receiver of all or any part of the assets, property or estate of any such guarantor; revocation or termination of, or limitation of liability upon, any guaranty of any or all of the Obligations; or commencement of proceedings by or against any guarantor or surety for Seller under any bankruptcy or insolvency law; (k) Seller makes any payment on account of any indebtedness or obligation which has been subordinated to the Obligations or if any person who has subordinated such indebtedness or obligation terminates or in any way limits his subordination agreement; (l) Seller shall generally not pay its debts as they become due or shall enter into any agreement (whether written or oral), or offer to enter into any such agreement, with all or a significant number of its creditors regarding any moratorium or other indulgence with respect to its debts or the participation of such creditors or their representatives in the supervision, management or control of the business of Seller; Seller shall conceal, remove or permit to be concealed or removed any part of its property, with intent to hinder, delay or defraud its creditors, or make or suffer any transfer of any of its property which may be fraudulent under any bankruptcy, fraudulent conveyance or similar law, or shall make any transfer of its property to or for the benefit of any creditor at a time when other creditors similarly situated have not been paid; or (m) Purchaser at any time, acting in good faith and in a commercially reasonable manner, deems itself insecure.

   **8.2 Remedies.** Upon the occurrence of any Event of Default, and at any time thereafter, Purchaser, at its option, and without notice or demand of any kind (all of which are hereby expressly waived by Seller) may do any one or more of the following: (a) Cease advancing money or extending credit to or for the benefit of Seller under this Agreement, and any other document or agreement; (b) Accelerate and declare all or any part of the Obligations to be immediately due, payable, and performable, notwithstanding any deferred or installment payments allowed by any instrument evidencing or relating to any Obligation; (c) Take possession of any or all of the Collateral wherever it may be found, and for that purpose Seller hereby authorizes Purchaser without judicial process to enter onto any of the Seller's premises without hindrance to search for, take possession of, keep, store, or remove any of the Collateral and remain on such premises or cause a custodian to remain thereon in exclusive control thereof without charge for so long as Purchaser deems necessary in order to complete the enforcement of its rights under this Agreement or any other agreement; provided, however,

that should Purchaser seek to take possession of any or all of the Collateral by court process or through a receiver, Seller hereby irrevocable waives: (i) any bond and any surety or security relating thereto required by any statute, court rule or otherwise as an incident to such possession; (ii) any demand for possession prior to the commencement of any suit or action to recover possession thereof; and (iii) any requirement that Purchaser retain possession of and not dispose of any such Collateral until after trial or final judgment; (d) Require Seller to assemble any or all of the Collateral and make it available to Purchaser at a place or places to be designated by Purchaser which is reasonably convenient to Purchaser and Seller, and to remove the Collateral to such locations as Purchaser may deem advisable; (e) place a receiver in exclusive control of Seller's business and/or any or all of the Collateral, in order to assist Purchaser in enforcing its rights and remedies; (f) Sell, ship, reclaim, lease or otherwise dispose of all or any portion of the Collateral in its condition at the time Purchaser obtains possession or after further manufacturing, processing or repair; at any one or more public and /or private sale(s) (including execution sales); in lots or in bulk; for cash, exchange for other property or on credit; and to adjourn any such sale from time to time without notice other than oral announcement at the time scheduled for sale. Purchaser shall have the right to conduct such disposition on Seller's premises without charge for such time or times as Purchaser deems fit, or on Purchaser's premises, or elsewhere and the Collateral need not be located at the place of disposition. Purchaser may directly or through any affiliated company purchase or lease any Collateral at any such public disposition and, if permissible under applicable law, at any private disposition. Any sale or other disposition of Collateral shall not relieve Seller of any liability Seller may have if any Collateral is defective as to title or physical condition at the time of sale; (g) Demand payment of, and collect any Accounts, Instruments, Chattel Paper, Supporting Obligations and General Intangibles comprising part or all of the Collateral; or (h) Demand and receive possession of any of Seller's federal and state income tax returns and the books, records and accounts utilized in the preparation thereof or referring thereto. Any and all attorneys' fees, expenses, costs, liabilities and obligations incurred by Purchaser with respect to the foregoing shall be added to and become part of the Obligations, shall be due on demand, and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations.

**8.3 Application of Proceeds.** The proceeds received by Purchaser from the disposition of or collection of any of the Collateral shall be applied to such extent and in such manner as Purchaser shall determine in its sole discretion. If any deficiency shall arise, Seller shall remain liable to Purchaser therefor. In the event that, as a result of the disposition of any of the Collateral, Purchaser directly or indirectly enters into a credit transaction with any third party, Purchaser shall have the option, exercisable at any time, in its sole discretion, of either reducing the Obligations by the principal amount of such credit transaction or deferring the reduction thereof until the actual receipt by Purchaser of cash therefor from such third party.

**8.4 Online Access.** Upon an Event of Default, all of Seller's rights and access to any online internet services that Purchaser makes available to Seller shall be provisional pending Seller's curing of all such Events of Default. During such period of time, Purchaser may limit or terminate Seller's access to online services. Seller acknowledges that the information Purchaser makes available to Seller through online internet access, both before and after an Event of Default, constitutes and satisfies any duty to respond to a request for accounting or request regarding a statement of account that is referenced in Section 9-210 of the UCC.

**8.5 Standards of Commercial Reasonableness**. After an Event of Default, the parties acknowledge that it shall be presumed commercially reasonable and Purchaser shall have no duty to undertake to collect any Account, including those in which Purchaser receives information from an Account Debtor that a Dispute exists. Furthermore, in the event Purchaser undertakes to collect or enforce an obligation of an Account Debtor or any other person obligated on the Collateral and ascertains that the possibility of collection is outweighed by the likely costs and expenses that will be incurred, Purchaser may at any such time cease any further collection efforts and such action shall be considered commercially reasonable. Before Seller may, under any circumstances, seek to hold Purchaser responsible for taking any uncommercially reasonable action, Seller shall first notify Purchaser in writing, of all of the reasons why Seller believes Purchaser has acted in any uncommercially reasonable manner and advise Purchaser of the action that Seller believes Purchaser should take.

**8.6 Remedies Cumulative.** In addition to the rights and remedies set forth in this Agreement, Purchaser shall have all the other rights and remedies accorded a secured party under the UCC and under any and all other applicable laws and in any other instrument or agreement now or hereafter entered into between Purchaser and Seller and all of such rights and remedies are cumulative and none is exclusive. Exercise or partial exercise by Purchaser of one or more of its rights or remedies shall not be deemed an election, nor bar Purchaser from subsequent exercise or partial exercise of any other rights or remedies. The failure or delay of Purchaser to exercise any rights or remedies shall not operate as a waiver thereof, but all rights and remedies shall continue in full force and effect until all of the Obligations have been fully paid and performed.

**9. Power of Attorney.** Seller grants to Purchaser an irrevocable power of attorney coupled with an interest authorizing and permitting Purchaser (acting through any of its employees, attorneys or agents) at any time, at its option but without obligation, with or without notice to Seller, and at Seller's sole expense, to do any or all of the following, in Seller's name or otherwise: (a) Execute on behalf of Seller any financing statement, continuation financing statement, financing statement amendment, security agreement, control agreement, deed of trust, mortgage, assignment of personal or real property lease, assignment of rentals from real or personal property, assignment, certificate of title, application for vehicle title, affidavit, report, notice, schedule of Account, and all other documents that Purchaser may, in its sole and absolute discretion, deem advisable in order to perfect, maintain or improve Purchaser's security interests in the Collateral or other real or personal property intended to constitute Collateral, or in order to exercise a right of

Seller or Purchaser, or in order to fully consummate all the transactions contemplated under this Agreement, and all other present and future agreements; (b) At any time after the occurrence of an Event of Default, execute on behalf of Seller any document exercising, transferring or assigning any option to purchase, sell or otherwise dispose of or to lease (as lessor or lessee) any real or personal property; (c) Execute on behalf of Seller, any invoices or other documents relating to any Account, any draft against any Account Debtor and any notice to any Account Debtor, any proof of claim in bankruptcy, any Notice of Lien, claim of mechanic's, materialman's or other lien, or assignment of satisfaction of mechanic's, materialman's or other lien; (d) Take control in any manner of any cash or noncash items of payment or proceeds of Collateral; endorse the name of Seller upon any instruments, notes, acceptances, checks, drafts, money orders, bills of lading, freight bills, chattel paper or other documents, evidence of payment or Collateral that may come into Purchaser's possession; (e) Upon the occurrence of any Event of Default, to receive and open all mail addressed to Seller; and, in the exercise of such right, Purchaser shall have the right, in the name of Seller, to notify the Post Office authorities to change the address for the delivery of mail addressed to Seller to such other address as Purchaser may designate including, but not limited to, Purchaser's own address; Purchaser shall turn over to Seller all of such mail not relating to the Collateral; such right to redirect mail granted to Purchaser is irrevocable and Seller shall not have the right to notify the Post Office to change the address for delivery after Purchaser has exercised such right; (f) Upon the occurrence of any Event of Default, to direct any financial institution which is a participant with Purchaser in extensions of credit to or for the benefit of Seller, or which is the institution with which any deposit account is maintained, to pay to Purchaser all monies on deposit by Seller with said financial institution which are payable by said financial institution to Seller, regardless of any loss of interest, charge or penalty as a result of payment before maturity; (g) Endorse all checks and other forms of remittances received by Purchaser "Pay to the Order of LightStar Financial Services, LLC," or in such other manner as Purchaser may designate; (h) Pay, contest or settle any lien, charge, encumbrance, security interest and adverse claim in or to any of the Collateral, or any judgment based thereon, or otherwise take any action to terminate or discharge the same; (i) Grant extensions of time to pay, compromise claims and settle Accounts and the like for less than face value and execute all releases and other documents in connection therewith; (j) Pay any sums required on account of Seller's taxes or to secure the release of any liens therefore, or both; (k) Settle and adjust, and give releases of any insurance claim that relates to any of the Collateral and obtain payment therefor, and make all determinations and decisions with respect to any such policy of insurance and endorse Seller's name on any check, draft, instrument or other item of payment or the proceeds of such policies of insurance; (l) Instruct any accountant or other third party having custody or control of any books or records belonging to, or relating to, Seller to give Purchaser the same rights of access and other rights with respect thereto as Purchaser has under Section 6.4 of this Agreement; and (m) Take any action or pay any sum required of Seller pursuant to this Agreement in order to carry out the purposes of this Agreement, and any other present or future agreements. Any and all sums paid and any and all costs expenses, liabilities, obligations and attorneys' fees incurred by Purchaser with respect to the foregoing shall be added to and become part of the Obligations and shall be payable on demand and shall bear interest at a rate equal to the highest interest rate applicable to any of the Obligations. In no event shall Purchaser's rights under the foregoing power of attorney or any of Purchaser's other rights under this Agreement be deemed to indicate that Purchaser is in control of the business, management of properties of Seller.

10. **General.**

    **10.1 Notices.** Any Written Notice to be given under this Agreement will be in writing addressed to the respective party as set forth in the heading to this Agreement and will be personally served, telecopied or sent by overnight courier service or United States Mail and will be deemed to have been given: (a) if delivered in person, when delivered; (b) if delivered by telecopy or e-mail, on the date of transmission if transmitted on a business day before 4:00 p.m. (Central Time) or, if not, on the next succeeding business day; (c) if delivered by overnight courier, two (2) days after delivery to such courier properly addressed; or (d) if by U.S. Mail, four (4) business days after depositing in the United States Mail, with postage prepaid and properly addressed. If there is more than one Seller, notice to any shall constitute notice to all; if Seller is a corporation, partnership or limited liability company, the service upon any member of the Board of Directors, general partner, managing member, officer, employee or agent shall constitute service upon Seller.

    **10.2 Payment in Full Checks.** Seller authorizes Purchaser to accept, indorse and deposit on behalf of Seller any checks tendered by an Account Debtor "in full payment" of its obligation to Seller. Seller shall not assert against Purchaser any claim arising therefrom, irrespective of whether such action by Purchaser affects an accord and satisfaction of Seller's claims, under Section 3-311 of the UCC.

    **10.3 Indemnity.** Seller shall indemnify and hold Purchaser harmless from and against any and all claims, debts, losses, demands, actions, causes of action, lawsuits, damages, penalties, judgments, liabilities, costs and expenses (including, without limitation, attorneys' fees), of any kind or nature which Purchaser may sustain or incur in connection with, or arising from, this Agreement, any other present or future agreement, or the breach by Seller of any representation, warranty, covenant or provision contained herein or therein, or any other transaction contemplated hereby or thereby or relating hereto or thereto, any Avoidance Action, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Purchaser relating in any way to Seller. Notwithstanding any other provision of this Agreement to the contrary, the indemnity agreement set forth in this Section shall survive termination of this Agreement. All Indemnity obligations shall be payable on demand. If Seller fails to honor this Section of the Agreement after termination of this Agreement, Purchaser may pursue all available rights and remedies under this Agreement and the Uniform Commercial Code as enacted in Missouri, including without limitation refilling a UCC-1 financing statement and collecting on all Accounts. Purchaser, may in its sole discretion, establishes an additional reserve to account for any

potential Avoidance Actions.

**10.4 Attorneys' Fees and Costs.** Seller shall forthwith pay to Purchaser the amount of all actual attorneys' fees and all filing, recording, publication, search and other costs incurred by Purchaser under and pursuant to this Agreement, or any other present or future agreement, or in connection with any transaction contemplated hereby or thereby, or with respect to the Collateral or the defense or enforcement of Purchaser's interests (whether or not Purchaser files a lawsuit against Seller), including, without limitation, charges of auditors, set-up charges, bank charges, and all office and other expenses and costs. Without limiting the generality of the foregoing, Seller shall, with respect to each and all of the foregoing, pay all actual attorneys' fees and costs Purchaser incurs in order to: obtain legal advice, enforce, or seek to enforce, any of its rights; prosecute actions against, or defend actions by, Account Debtors; commence, intervene in, respond to, or defend any action or proceeding; initiate any complaint to be relieved of the effect of the automatic stay in bankruptcy in order to commence or continue any foreclosure or other disposition of the Collateral or to commence or continue any action or other proceeding against Seller for relating to the Collateral; file or prosecute a claim or right in any action or proceeding including, but not limited to, any probate claim, bankruptcy claim, third-party claim, secured creditor claim or reclamation complaint, examine, audit, count, test, copy, or otherwise inspect any of the Collateral or any of Seller's books and records; or protect, obtain possession of, lease, dispose of, or otherwise enforce any security interest in or lien on, the Collateral or represent Purchaser in any litigation with respect to Seller's affairs. In the event that Purchaser files any lawsuit against the Seller predicated on a breach of this Agreement, or in any way relates to this Agreement, Purchaser shall be entitled to recover its costs and attorneys' fees, including but not limited to attorneys' fees and costs incurred in the enforcement of, execution upon or defense of any order, decree, award or judgment. All attorneys' fees and costs to which Purchaser may be entitled pursuant to this Section shall immediately become part of Seller's Obligations, and shall be due on demand.

**10.5 No Lien Termination without Release.** In recognition of the Purchaser's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by Collateral, notwithstanding payment in full of all Obligations by Seller, Purchaser shall not be required to record any terminations or satisfactions of any of Purchaser's liens on the Collateral unless and until Seller has executed and delivered to Purchaser a general release in a form suitable to Seller. Seller understands that this provision constitutes a waiver of its rights under Section 9-513 of the UCC.

**10.6 Benefit of Agreement.** The provisions of this Agreement shall be binding upon and inure to the benefit of the respective successors, assigns, heirs, beneficiaries and representatives of the parties hereto; provided, however, that Seller may not assign or transfer any of its rights under this Agreement without the prior written consent of Purchaser, and any prohibited assignment shall be void. No consent by Purchaser to any assignment shall relieve Seller or any guarantor from its liability for the Obligations. Without limiting the generality of the foregoing, all rights and benefits of Purchaser under this Agreement may be exercised by any institution with which Purchaser maintains any rediscount, factoring or other relationship and by any other person or entity designated by Purchaser.

**10.7 Joint and Several Liability.** The liability of each Seller shall be joint and several and the compromise of any claim with, or the release of, any Seller shall not constitute a compromise with, or a release of, any other Seller.

**10.8 General Waivers.** The failure of Purchaser at any time or times hereafter to require Seller strictly to comply with any of the provisions, warranties, terms or conditions of this Agreement or any other present or future instrument or agreement between Seller and Purchaser shall not waive or diminish any right of Purchaser thereafter to demand and receive strict compliance therewith and with any other provision warranty, term and condition; and any waiver of any default shall not waive or affect any other default, whether prior or subsequent thereto and whether of the same or of a different type. None of the provisions, warranties, terms or conditions of this Agreement or other instrument or agreement now or hereafter executed by Seller and delivered to Purchaser shall be deemed to have been waived by any act or knowledge of Purchaser or its agents or employees, but only by a specific written waiver signed by an officer of Purchaser and delivered to Seller. Seller waives any and all notices or demands which Seller might be entitled to receive with respect to this Agreement, or any other agreement by virtue of any applicable law. Seller hereby waives demand, protest, notice of protest and notice of default or dishonor, notice of payment and nonpayment, release, compromise, settlement, extension or renewal of any commercial paper, instrument, Account, general intangible, document or guaranty at any time held by Purchaser on which Seller is or may in any way be liable, and notice of any action taken by Purchaser unless expressly required by this Agreement. Seller hereby ratifies and confirms whatever Purchaser may do pursuant to this Agreement and agrees that Purchaser shall not be liable for the safekeeping of the Collateral or any loss or damage thereto, or diminution in value thereof, from any cause whatsoever, any act or omission of any carrier, warehouseman, bailee, forwarding agent or other person, or any act of commission or any omission by Purchaser or its officers, employees, agents, or attorneys, or any of its or their errors of judgment or mistakes of fact or of law.

**10.9 Section Headings; Construction.** Section headings are used herein for convenience only. Seller acknowledges that the same may not describe completely the subject matter of the applicable Section, and the same shall not be used in any manner to construe, limit, define or interpret any term or provision hereof. This Agreement has been fully reviewed and negotiated between the parties and no uncertainty or ambiguity in any term or provision of this Agreement shall be construed strictly against Purchaser or Seller under any rule of construction or otherwise.

**10.10 Destruction of Seller's Documents; Limitation of Actions.** Any documents, schedules, invoices or other papers delivered to Purchaser may be destroyed or otherwise disposed of by Purchaser six (6) months after the same are delivered to Purchaser, unless Seller makes written request therefor and pays all expenses attendant to their return, in which event Purchaser shall return same when Purchaser's actual or anticipated need therefor has terminated. Seller agrees that any claim or cause of action by Seller against Purchaser, its directors, officers, employees, agents, accountants or attorneys, based upon, arising from, or relating to this Agreement, or any other present or future agreement, or any other transaction contemplated hereby or thereby or relating hereto or thereto, or any other matter, cause or thing whatsoever, occurred, done, omitted or suffered to be done by Purchaser, its directors, officers, employees, agents, accountants, or attorneys, relating in any way to Seller, shall be barred unless asserted by Seller by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within six (6) months after the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based, and the service of a summons and complaint on an officer of Purchaser, or on any other person authorized to accept service on behalf of Purchaser, within thirty (30) days thereafter. Seller agrees that such six-month period provided herein shall not be waived, tolled, or extended except by the written consent of Purchaser in its sole and absolute discretion. This provision shall survive any termination, however arising, of this Agreement and any other present or future agreement.

**10.11 Severability.** Should any provision, clause or condition of this Agreement be held by any court of competent jurisdiction to be void, invalid, inoperative, or otherwise unenforceable, such defect shall not affect any other provision, clause or condition, and the remainder of this Agreement shall be effective as though such defective provision, clause or condition had not been a part hereof.

**10.12 Integration.** This Agreement and such other written agreements, documents and instruments as may be executed in connection herewith shall be construed together and constitute the entire, only and complete agreement between Seller and Purchaser, and all representations, warranties, agreements, and undertakings heretofore or contemporaneously made, which are not set forth herein or therein, are superseded hereby.

**10.13 Amendment.** The terms and provisions of this Agreement may not be waived, altered, modified or amended except in a writing executed by Seller and a duly authorized officer of Purchaser.

**10.14 Time of Essence.** Time is of the essence in the performance by Seller of each and every obligation under this Agreement.

**10.15 Governing Law; Jurisdiction; Venue.** This Agreement and all acts and transactions hereunder and thereunder and all rights and obligations of Purchaser and Seller shall be governed, construed and interpreted in accordance with the internal laws of the State of Missouri. Seller: (i) agrees that all actions or proceedings relating directly or indirectly hereto shall, at the option of Purchaser, be litigated in courts located within said state, and that, at the option of Purchaser, the exclusive venue, at Purchaser's sole option, therefor shall be Buchanan County, Missouri; (ii) consents to the jurisdiction and venue of any such court and consents to service of process in any such action or proceeding by personal delivery or any other method permitted by law; and (iii) waives any and all rights Seller may have to object to the jurisdiction of any such court, or to transfer or change the venue of any such action or proceeding.

**10.16 Waiver of Right to Jury Trial.** PURCHASER AND SELLER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL IN ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OTHER PRESENT OR FUTURE INSTRUMENT OR AGREEMENT BETWEEN PURCHASER AND SELLER, AND ANY CONDUCT, ACTS OR OMISSIONS OF PURCHASER OR SELLER OR ANY OF THEIR DIRECTORS, MEMBERS, PARTNERS, OFFICERS, EMPLOYEES, AGENTS, ATTORNEYS OR ANY OTHER PERSONS AFFILITATED WITH PURCHASER OR SELLER. PURCHASER AND SELLER ACKNOWLEDGE THAT THIS WAVIER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR RELATED FUTURE DEALINGS. PURCHASER AND SELLER FURTHER WARRANT AND REPRESENT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

     **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement through their duly authorized officers as of the Effective Date.

**LIGHTSTAR FINANCIAL SERVICES, LLC**

By: _____
Name:  Janelle Glidewell
Its: Member/CEO

**VANGUARD HEALTH & WELLNESS, LLC**

By: _____
Name: AMO Holdings, LLC by Alexander Green
Its: Vice President

By: _____
Name: Marina Zayats
Its: President

---

For Seller:

State of _____

County of _____

On this \_\_\_\_\_ day of _____ in the year of _____, before me, the undersigned notary public, personally appeared _____, known to me to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged that he/she/they executed the same for the purposed therein contained.  In witness whereof, I hereunto set my hand and official seal.

                                                       _____
   (seal)                                         Notary Public

## SCHEDULE 5.3

| Account Debtor | Provider Name | Provider Identification Number |
|---|---|---|
| Medicare (J11 MAC SC/HHH-Palmetto GBA) | Vanguard Health & Wellness, LLC | Provider Number: 14-8311<br>NPI Number: 1477858298<br>Tax Identification Number: 27-4577705<br>Other (please include a description of the number and the number itself): _____ |
| | | Provider Number: _____<br>NPI Number: _____<br>Tax Identification Number: _____<br>Other (please include a description of the number and the number itself):_____ |
| | | Provider Number: _____<br>NPI Number: _____<br>Tax Identification Number: _____<br>Other (please include a description of the number and the number itself):_____ |
| | | Provider Number: _____<br>NPI Number: _____<br>Tax Identification Number: _____<br>Other (please include a description of the number and the number itself):_____ |
| | | Provider Number: _____<br>NPI Number: _____<br>Tax Identification Number: _____<br>Other (please include a description of the number and the number itself):_____ |
| | | Provider Number: _____<br>NPI Number: _____<br>Tax Identification Number: _____<br>Other (please include a description of the number and the number itself):_____ |
| | | Provider Number: _____<br>NPI Number: _____<br>Tax Identification Number: _____<br>Other (please include a description of the number and the number itself):_____ |
| | | Provider Number: _____<br>NPI Number: _____<br>Tax Identification Number: _____<br>Other (please include a description of the number and the number itself):_____ |
| | | Provider Number: _____<br>NPI Number: _____<br>Tax Identification Number: _____<br>Other (please include a description of the number and the number itself):_____ |